305 Ga. 333
FINAL COPY

S18A1121. CONLEY v. PATE.

BLACKWELL, Justice.

Brandon Pate was convicted in 2010 of statutory rape, aggravated assault, and possession of a knife during the commission of a felony. He was sentenced to imprisonment for 20 years for the statutory rape, a consecutive term of probation for 20 years for the aggravated assault, and a consecutive term of probation for five years for the possession of a knife. In 2013, Pate filed a petition for a writ of habeas corpus, challenging his sentence. The habeas court concluded that his sentence was unlawful in several respects and issued the writ. The Warden appeals, and we reverse.

1. The evidence presented at Pate's trial shows as follows. On an evening in late December 2006 or early January 2007, 13-year-old M. R. was at her home in Gwinnett County. Although her father had forbidden visitors, M. R. invited her best friend, K. E., to visit. Pate (who then was 15 years old) and another boy drove K. E. to M. R.'s home and dropped her off. K. E. snuck

through a window into M. R.'s bedroom, where the girls watched television and ate snacks. All the while, M. R.'s father was asleep in an adjoining bedroom.

At some point, Pate and the other boy returned to M. R.'s home, ostensibly to pick up K. E. Pate entered M. R.'s bedroom through the window and asked M. R., "When are you going to give it up to me?" M. R. told Pate that she did not want to have sex with him. Pate continued to ask for sex, and M. R. continued to refuse him. Pate then pulled a knife from his pocket and said, "Well, if you're not going to have sex with me, then I'm going to slit your dad's throat." Believing the threat to be credible, M. R. gave in to Pate's demands. He took off her clothes and twice had sex with her. After Pate finished, he left with K. E. and the other boy. M. R. kept quiet about the incident for nearly two years, and in December 2008, she told her father, who reported the incident to law enforcement.[1]

---

[1] At trial, the prosecution's case consisted primarily of the testimony of M. R., K. E., and the investigating officers. The prosecution also offered the testimony of another girl, M. K., as evidence of a similar transaction. M. K. had dated Pate, and she testified that in April 2007, Pate "raped" her. More specifically, M. K. testified that she and Pate were playing pool in the basement of her house, "[a]nd he just started getting to the point where he was like, oh, he loved me, he loved me, don't you. And, you know, sure. And then he started getting rough and he just — he made me have sex with him." Afterwards, M. K. testified, Pate threatened to kill her father if she told anyone. The defense called a number

A grand jury indicted Pate in April 2009, charging him with forcible rape, statutory rape, unlawful possession of a knife during the commission of felony statutory rape, terroristic threats, two counts of aggravated assault, two counts of burglary, and two counts of cruelty to children in the third degree. Beginning in March 2010, Pate was tried by a jury, which found him guilty of the statutory rape of M. R., an aggravated assault with a deadly weapon upon M. R., and possession of a knife during the commission of felony statutory rape. The jury acquitted Pate of the other charges. After sentencing, Pate appealed, raising several claims of error, but none of the claims upon which the habeas court later granted him relief. The Court of Appeals affirmed in Pate v. State, 315 Ga. App. 205 (726 SE2d 691) (2012).

In December 2013, Pate filed a petition for a writ of habeas corpus in Washington County, where he is incarcerated. In his original petition, Pate asserted claims that he was denied the effective assistance of counsel at trial and on direct appeal. After several continuances, Pate retained counsel. In June 2017, his counsel filed an amended petition, in which Pate claimed for the first time that the statutory rape of which he was found guilty is only a

_____

of witnesses, whose testimony, if the jury had believed them, would have discredited the accounts of M. R., K. E., and M. K.

misdemeanor, and it cannot, therefore, sustain a felony sentence of 20 years for statutory rape or a conviction for possession of a knife in the commission of a felony; that his sentence of imprisonment for 20 years is in any event so disproportionate to the crime of statutory rape that it amounts to cruel and unusual punishment; and that the sentencing court erred when it sentenced him for aggravated assault without considering the Youthful Offender Act, OCGA § 42-7-1 et seq. Following a hearing, the habeas court concluded that Pate was entitled to relief on each of these new grounds and issued the writ.

2. We first consider the determination of the habeas court that the statutory rape of which Pate was found guilty is only a misdemeanor.[2] The habeas court reasoned that Pate was "not more than two years older" than M.

---

[2] The Warden argues that Pate has procedurally defaulted all of his claims, having failed to raise them on direct appeal, and because the habeas court did not even consider procedural default, the writ ought to be reversed on that basis alone. See OCGA § 9-14-48 (d) (stating that "habeas corpus relief shall not be granted" in the event of procedural default, subject to certain exceptions). We agree that the habeas court erred when it issued the writ without considering procedural default. See id. But we need not remand this case for consideration of procedural default or resolve this issue ourselves. As discussed below, Pate is not entitled to any relief on the merits, even if he could overcome a procedural default. See Baxter v. Kemp, 260 Ga. 184, 186 (2) (391 SE2d 754) (1990) (affirming the denial of petitioner's habeas claims on the merits without resolving issues of procedural default), overruled on other grounds by Height v. State, 278 Ga. 592, 595 (1) (604 SE2d 796) (2004). See also Hall v. Lance, 286 Ga. 365, 377 (III) (A) (687 SE2d 809) (2010). Accord Muhammad v. Secretary, Florida Dept. of Corrections, 733 F3d 1065, 1072-1073 (III) (A) (1) (11th Cir. 2013).

R. at the time of the statutory rape, and for that reason, his conduct was punishable only as a misdemeanor under OCGA § 16-6-3 (c). Subsection (c) provides:

> If the victim is at least 14 but less than 16 years of age and the person convicted of statutory rape is 18 years of age or younger and is no more than four years older than the victim, such person shall be guilty of a misdemeanor.

By its plain terms, subsection (c) applies *only* when the victim is "at least 14 [years of age]." Here, M. R. was only 13 years of age at the time of the statutory rape. Accordingly, subsection (c) does not apply,[3] the statutory rape of which Pate was found guilty is punishable as a felony, see OCGA § 16-6-3 (b), and the statutory rape is an adequate predicate for the conviction for possession of a knife during the commission of a felony.

3. We turn next to the claim that the sentence of imprisonment for 20 years for statutory rape amounts to cruel and unusual punishment. Both the

---

[3] Relying on our decision in Humphrey v. Wilson, 282 Ga. 520 (652 SE2d 501) (2007), Pate argues that OCGA § 16-6-3 (c) evidences a general legislative intent to punish sexual acts between teenagers only as misdemeanors. But the terms of subsection (c) speak for themselves. See Deal v. Coleman, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). By those terms, subsection (c) does not apply here. And we cannot rewrite a statute that "almost" fits a case to make it apply where it clearly does not. See Abdulkadir v. State, 279 Ga. 122, 124 (2) (610 SE2d 50) (2005) ("A court of law is not authorized to rewrite the statute by inserting additional language that would expand its application to include . . . other crimes.").

Eighth Amendment of the United States Constitution and Article I, Section I, Paragraph XVII of the Georgia Constitution "prohibit inflicting cruel and unusual punishments." Johnson v. State, 276 Ga. 57, 62 (5) (573 SE2d 362) (2002) (citations and punctuation omitted). The term "cruel and unusual" encompasses "not only barbaric punishments, but also sentences that are [grossly] disproportionate to the crime committed." Bradshaw v. State, 284 Ga. 675, 676-677 (2) (671 SE2d 485) (2008) (citations and punctuation omitted).[4] Where, as here, a sentence is not challenged as barbaric or otherwise categorically prohibited,[5] a court engages in a two-step inquiry to determine whether that sentence is grossly disproportionate. First, a court compares "the gravity of the offense and the severity of the sentence." Adams v. State, 288 Ga. 695, 701 (4) (707 SE2d 359) (2011) (citation and punctuation omitted). If

---

[4] We apply the same standard under both the Eighth Amendment and the Georgia Constitution to assess whether a sentence is grossly disproportionate. See Pierce v. State, 302 Ga. 389, 401-403 (3) (c) (807 SE2d 425) (2017); Wilson, 282 Ga. at 524-525 (3) (a).

[5] For example, the United States Supreme Court has held that the Eighth Amendment categorically prohibits a life without parole sentence for a juvenile offender, even for a crime involving homicide, absent a consideration of the defendant's youth and a finding that he is "the rare juvenile offender whose crime reflects irreparable corruption." Miller v. Alabama, 567 U. S. 460, 479 (II) (132 SCt 2455, 183 LE2d 407) (2012) (citation and punctuation omitted). See also Graham v. Florida, 560 U. S. 48, 82 (III) (D) (130 SCt 2011, 176 LE2d 825) (2010) (holding that the Eighth Amendment categorically prohibits a sentence of life without parole for non-homicide crimes committed by juveniles). No such categorical prohibition applies here, and Pate does not argue otherwise.

this threshold comparison "leads to an inference of gross disproportionality," the court proceeds to the next step and compares "the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." Id. (Citation and punctuation omitted.)

"We have emphasized that it is the rare case in which the threshold inference of gross disproportionality will be met and a rarer case still in which that threshold inference stands after further scrutiny." Adams, 288 Ga. at 701 (4) (citation and punctuation omitted). See also Pierce v. State, 302 Ga. 389, 402 (3) (c) (807 SE2d 425) (2017). Importantly, when assessing the "gravity of the offense" as part of the threshold comparison, courts do not look only at the statutory elements of the offense in question. Rather, they consider what actually happened — the particular circumstances of the crimes at issue — as shown by the record. See Pierce, 302 Ga. at 402-403 (3) (c) (considering the specific circumstances of defendant's offense in determining that his sentence did not meet the threshold inference of gross disproportionality); Jones v. State, 290 Ga. 670, 676 (3) (725 SE2d 236) (2012) (same); Adams, 288 Ga. at 702 (4) (same). See also Solem v. Helm, 463 U. S. 277, 296-297, 303 (IV) (103 SCt 3001, 77 LE2d 637) (1983) (examining the defendant's "relatively minor

criminal conduct" in determining that a sentence of life without parole was grossly disproportionate).

In this case, the habeas court's inference of gross disproportionality rested principally on its view that the conduct underlying Pate's conviction for statutory rape was merely "consensual sex with an individual younger than him" and was only a "passive felony." But the record shows that this characterization is wrong. The trial evidence, as summarized above, shows that M. R. did not readily consent to sex with Pate at all — she refused him repeatedly and expressly. She finally gave in and agreed to have sex with Pate only after he brandished a knife and threatened to kill her father, who was asleep in an adjoining bedroom.[6] To call such conduct "consensual sex" and only a "passive felony" is to grossly mischaracterize what Pate did to M. R. Cf. Bradshaw, 284 Ga. at 679 (2) (b) (defendant's crime was a "passive felony" because it involved "neither violence nor threat of violence to any person" (citation and punctuation omitted)). As we have explained, we look to the underlying facts of the offense to determine whether a given sentence is grossly

---

[6] We know that the jury credited the evidence about Pate brandishing a knife and threatening the victim; that evidence formed the basis for its verdict that Pate was guilty of aggravated assault with a deadly weapon.

disproportionate. See Jones, 290 Ga. at 676 (3) (considering defendant's aggravated assault in determining that his 25-year sentence for kidnapping was not grossly disproportionate).

In support of the habeas court's finding of gross disproportionality, Pate points to Humphrey v. Wilson, 282 Ga. 520 (652 SE2d 501) (2007). There, a majority of the Court concluded that a sentence of imprisonment for ten years for aggravated child molestation was grossly disproportionate to the crime, which involved a 15-year-old "willingly performing oral sex on" the 17-year-old defendant. Id. at 520-521. Along the way to that conclusion, the majority attached great significance to the fact that soon after the defendant was tried for his crime, the General Assembly amended the statute under which he was convicted and made criminal conduct like his punishable only as a misdemeanor. See id. at 527-528.[7] Although the statutory amendment expressly applied only prospectively and did not, therefore, actually apply to the defendant in Wilson, the majority reasoned that the amendment reflected a legislative determination that conduct like that for which the defendant had been convicted was not sufficiently culpable to warrant a sentence of

_____

[7] See OCGA § 16-6-4 (d) (2).

imprisonment for ten years, a determination that it weighed heavily in the assessment of proportionality. See id. at 530.

Pate's reliance on Wilson is misplaced. To begin, unlike Pate, the defendant in Wilson did not brandish a knife and threaten to kill anyone, and as we have explained, the underlying circumstances of an offense are important in assessing the proportionality of the punishment. Moreover, even if we thought that the approach taken in Wilson were analytically sound and would be inclined to take a similar approach here, that approach would not help Pate.[8] Indeed, Pate points to OCGA § 16-6-3 (c) and says that, as in Wilson, the General Assembly has determined that conduct like his ought to be punished only as a misdemeanor. But as we noted earlier, OCGA § 16-6-3 (c) simply does not apply to conduct like his — having sex with a 13-year-old. See Bunn v. State, 291 Ga. 183, 191 (2) (b) (728 SE2d 569) (2012) (observing that age limitation in statute "represents the sort of line-drawing and balancing of rights and interests regularly and properly done by legislatures"). And so, unlike in Wilson, there is no indication in this case that the General Assembly ever has

---

[8] Some of us have doubts about the soundness of the approach taken in Wilson. But because Wilson is readily distinguishable, we need not resolve those doubts in this case.

concluded that conduct like that for which Pate was convicted ought to be punished only as a misdemeanor.

Pate's sentence of 20 years' imprisonment for statutory rape does not meet even the threshold inference of gross disproportionality, and so, despite his young age, his sentence for statutory rape must stand. See Johnson v. State, 276 Ga. 57, 62-63 (573 SE2d 362) (2002) ("[W]e are unable to say that the societal consensus in Georgia or the United States opposes sentencing youthful offenders convicted of violent offenses to long terms of incarceration."). See also Adams, 288 Ga. at 702 (4) (life sentence with 25 years to serve was not unconstitutional for juvenile defendant convicted of aggravated child molestation).

4. Last, we turn to the conclusion of the habeas court that the sentencing court improperly failed to consider the Youthful Offender Act, OCGA § 42-7-1 et seq., when it sentenced Pate for aggravated assault. Such a claim is not of constitutional dimensions and so "is not cognizable in a habeas action." Green v. Dunn, 257 Ga. 66, 66 (355 SE2d 61) (1987). See OCGA § 9-14-42 (a) (habeas action may be brought by a prisoner who "asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of this state"). Whether

to sentence a defendant under the Youthful Offender Act is purely a matter of discretion for the sentencing court; a failure to exercise discretion under the statute to impose an ostensibly more lenient sentence does not amount to a deprivation of due process or some other constitutional right remediable by a writ of habeas corpus. See OCGA § 42-7-9 (a) ("Nothing in [the Youthful Offender Act] shall limit or affect the power of any court to proceed in accordance with any other applicable provisions of law."); Woods v. State, 233 Ga. 347, 349 (4) (211 SE2d 300) (1974). Compare Harvey v. Meadows, 280 Ga. 166, 168 (3) (626 SE2d 92) (2006) ("[C]onfinement under a sentence that is *longer than that permitted by state law* constitutes a denial of liberty without due process of law." (Citation and punctuation omitted; emphasis supplied)).[9] For the foregoing reasons, we reverse.

Judgment reversed. All the Justices concur, except Ellington, J., disqualified.

---

[9] We also note that the sentence for aggravated assault was probated, meaning that Pate can serve this sentence outside of confinement. We doubt that a sentence under the Youthful Offender Act would have been more lenient. See OCGA § 42-7-3 (a) ("Youthful offenders shall undergo treatment in secure institutions . . . .").

PETERSON, Justice, concurring.

I am skeptical that our analytical approach to the Cruel and Unusual Punishment Clause of the Georgia Constitution is consistent with the original public meaning of that Clause. But because even under that approach the grant of habeas corpus must be reversed, it is not necessary to reconsider that approach here. Accordingly, I concur in the opinion of the majority.

"[W]e should not simply recite holdings of the United States Supreme Court regarding [a provision of the United States Constitution] and uncritically import them into our interpretation of [a parallel provision] of the Georgia Constitution." Elliott v. State, 305 Ga. 179, 188 (II) (C) (824 SE2d 265) (2019). But for the last several decades, we have done precisely that in our application of Georgia's Cruel and Unusual Punishment Clause. Instead, we should interpret the Clause according to its original public meaning, informed by its text, context, and history. Id.; see also Maxim Cabaret, Inc. v. City of Sandy Springs, 304 Ga. 187, 195-196 (816 SE2d 31) (2018) (Peterson, J., concurring) (expressing doubt regarding our construction of Georgia's Free Speech Clause as identical with the First Amendment to the United States Constitution

"without any consideration of the text, context, or history" of the Georgia clause); Diversified Holdings, LLP v. City of Suwanee, 302 Ga. 597, 615 (807 SE2d 876) (2017) (Peterson, J., concurring) (noting that the textual difference between the Takings Clause of the Fifth Amendment to the United States Constitution and the Just Compensation Clause of the Georgia Constitution "seems to me significant enough to raise questions about the validity of our case law often interpreting the Clauses as essentially the same").

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U. S. Const. Amend. VIII. The relevant provision of Georgia's Constitution reads identically: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted . . . ." Ga. Const. of 1983, Art. I, Sec. I, Par. XVII. This provision has been word-for-word identical through every Georgia Constitution since 1861. See Ga. Const. of 1861, Art. I, Sec. XIV;[10] Ga. Const. of 1865, Art. I, Sec. XI; Ga. Const. of 1868, Art. I, Sec. 16; Ga. Const. of 1877, Art. I, Sec. I, Par. IX; Ga. Const. of

---

[10] The only difference between these provisions was that the 1861 provision separated its clauses by semicolons instead of commas.

1945, Art. I, Sec. I, Par. IX; Ga. Const. of 1976, Art. I, Sec. I, Par. XIV.[11] And because "we generally presume that a constitutional provision retained from a previous constitution without material change has retained the original public meaning that provision had at the time it first entered a Georgia Constitution, absent some indication to the contrary[,]" Elliott, 305 Ga. at __ (II) (A), interpretation of this provision requires consideration of its meaning in 1861.

Shortly after the Georgia provision's adoption, we explained the meaning of the prohibition on cruel and unusual punishment: "so long as [the General Assembly does] not provide cruel and unusual punishments, such as disgraced the civilization of former ages, and make one shudder with horror to read of them, as drawing, quartering, burning, etc., the Constitution does not put any limit upon legislative discretion." Whitten v. State, 47 Ga. 297, 301

---

[11] Georgia's first Constitution, the Constitution of 1777, also prohibited excessive fines and bail, but did not specifically prohibit cruel and unusual punishment. See Ga. Const. of 1777, Art. LIX ("Excessive fines shall not be levied, nor excessive bail demanded."). No such provision appeared in the Constitutions of 1789 or 1798. And over time, whipping and banishment were also singled out as prohibited as criminal punishment. See Ga. Const. of 1868, Art. I, Sec. XXII ("Whipping, as a punishment for crime, is prohibited.); Ga. Const. of 1877, Art. I, Sec. I, Par. VII ("Neither banishment beyond the limits of the State, nor whipping, as a punishment for crime, shall be allowed."); Ga. Const. of 1945, Art. I, Sec. I, Par. VII (same); Ga. Const. of 1976, Art. I, Sec. I, Par. XVIII (same); Ga. Const. of 1983, Art. I, Sec. I, Par. XXI (materially the same).

(1872). We strongly endorsed this history-bound construction as to both the federal and state constitutions as late as the early 1970s. See, e.g., Evans v. State, 228 Ga. 867, 872 (5) (b) (188 SE2d 861) (1972); Dutton v. Smart, 222 Ga. 35, 36-37 (2) (148 SE2d 396) (1966); Sims v. Balkcom, 220 Ga. 7, 10 (2) (136 SE2d 766) (1964). And we expressly viewed this construction as incompatible with what would become the United States Supreme Court's "evolving standards of decency" analysis. See Sims, 220 Ga. at 11 ("we would question the judicial right of any American judge to construe the American Constitution contrary to its apparent meaning, the American history of the clause, and its construction by American courts, simply because the numerous nations and States have abandoned capital punishment for rape") (citing with criticism Rudolph v. Alabama, 375 U. S. 889, 889 (84 SCt 155, 11 LE2d 119) (1963) (Goldberg, J., dissenting from denial of certiorari)).

But then the United States Supreme Court's dramatic shift in interpretation of the Eighth Amendment during the 1970s — including the invalidation of Georgia's death penalty — knocked us off course. And by the late 1980s, we had reversed course entirely. In Fleming v. Zant, we quoted Whitten but omitted the history-bound language that cabined its meaning: "[T]he constitutional standard reflects society's view of what punishments are

cruel, and prohibits those that 'disgraced the civilizations of former ages, . . . mak(ing) one shudder with horror to read them.'" <u>Fleming v. Zant</u>, 259 Ga. 687, 689 (3) (386 SE2d 339) (1989). And then, in the very next sentence, we flatly ignored the history and context of the Georgia Constitution, as well as over 100 years of Georgia precedent: "In other words, whether a particular punishment is cruel and unusual is not a static concept, but instead changes in recognition of the 'evolving standards of decency that mark the progress of a maturing society.'" Id. (quoting, inter alia, <u>Trop v. Dulles</u>, 356 U. S. 86, 101 (78 SCt 590, 2 LE2d 30) (1958) (plurality opinion)).

Ever since, we have applied the United States Supreme Court's "evolving standards of decency" analysis to decide questions under the Georgia Constitution. It seems to me quite likely that such an approach cannot be squared with the original public meaning of the Georgia Constitution, and if it cannot, we should reconsider our approach in the proper case.

Decided March 4, 2019.

Habeas corpus. Washington Superior Court. Before Judge Palmer.

Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellant.

Ecleynne Mercy; Timothy O. McCalep, for appellee.